THE HON. RICHARD JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR18-131 RAJ |
| Plaintiff, | |
| v. | REPLY OF DEFENDANT REGARDING RECONSIDERATION |
| LAMONT JEFFREY REYNOLDS, | |
| Defendant. | |

COMES NOW Lamont Jeffrey Reynolds, the defendant, by and through his attorney, Neil M. Fox, and files this reply to the *United States' Response to Defendant's Motion for Reconsideration*, Dkt. 1343.

**1.    *The Government Belatedly Recognizes Mr. Reynolds' Medical Conditions Justify Release***

The Government now concedes that Mr. Reynolds' "stage 2 kidney disease is a medical condition recognized by the CDC in its June 25, 2020 update as one of the conditions that puts people at an increased risk of severe illness from COVID-19. As such, the government does not dispute that the Defendant's stage 2 kidney disease in the context of COVID-19 presents an 'extraordinary and compelling reason' that allows this Court to exercise its discretion to consider whether a reduction in sentence is warranted." Dkt. 1343 at 1. The Government "also does not argue here about the significance of the Defendant's

REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 1
*United States v. Cheatham et al.*, No. CR18-131 RAJ

Law Office of Neil Fox, PLLC
2125 Western Ave., Suite 330
Seattle, Washington 98121
206-728-5440

recovery from COVID-19. The CDC's guidance indicates that it does not know whether people who recover from COVID-19 can become infected again." Dkt. 1343 at 3 n.1.[1]

Significantly, none of Mr. Reynolds' medical records provided to the Court by the Government in the past six weeks or so[2] set out any information about Stage 2 kidney disease. Indeed, a review of the Government's pleading filed on May 12, 2020, reveals no mention of this condition at all. Dkt. 1297 at 4-5 (mentioning hypertension, obesity and pain from accident and shooting). The existence of Mr. Reynolds' kidney disease was only noticed when Mr. Reynolds had the BOP medical records reviewed by an independent physician, Dr. Alexander Schafir. It was Dr. Schafir who concluded that Reynolds had either Stage 2 or Stage 3 chronic kidney disease based upon the March 29, 2019, labs. Dkt. 1301 at 20 (Ex. 1). In other words, despite the fact that BOP's own labs revealed a very serious medical condition, BOP apparently did nothing with the information in the past year and a quarter, and in fact, BOP's records over most of the time Reynolds has been incarcerated do not mention even that Reynolds suffers from this condition. In the most recent records disclosed by the Government, it appears that Dr. Dhaliwal noted the October 2019 creatinine level (Dkt. 1345 at 1), but apparently did nothing further – i.e. he did not retake a new blood sample to see what Mr. Reynolds' current levels were to assess his current level of renal failure.

While the Government criticizes Dr. Schafir's opinions, Dkt. 1343 at 6-7, it is only because Dr. Schafir reviewed the BOP lab work that the Government now begrudgingly concedes that Reynolds has serious health issues. To be sure, Dr. Schafir has not personally

---

[1] The Government's concession here is qualified by noting "that FCI Lompoc had many positive COVID-19 cases but now has only one." Dkt. 1343 at 3 n.1. However, there is no indication that BOP has engaged in any widespread testing of residents of FCI Lompoc since early May so the Government's claim that there is only one person there with COVID-19 is speculative and not supported by accurate data.

[2] As noted previously, BOP simply refuses to provide Mr. Reynolds' counsel with updated medical information, forcing counsel to rely on the Government's filings. Dkt. 1331 at 4; Dkt. 1317, Ex. 1. This refusal of BOP to provide information to Mr. Reynolds' lawyer, combined with restrictions on the ability to have extensive legal calls and the inability to have Mr. Reynolds examined by an independent doctor, leaves us at the mercy of BOP to provide accurate information about Mr. Reynolds. Given BOP's obvious biases and its incentive to downplay the seriousness of both Mr. Reynolds' medical condition and the situation at FCI Lompoc, there are legitimate questions as to Mr. Reynolds' true medical condition.

REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 2
*United States v. Cheatham et al.*, No. CR18-131 RAJ

Law Office of Neil Fox, PLLC
2125 Western Ave., Suite 330
Seattle, Washington 98121
206-728-5440

1  examined Mr. Reynolds, but Mr. Reynolds has unsuccessfully asked the Court to order him

2  evaluated by an outside doctors so this criticism has no validity.[3]

3        Moreover, the Government now accepts the fact that Mr. Reynolds has kidney disease

4  and essentially accepts Dr. Samra's declaration that it is unknown whether there is a risk of

5  reinfection with COVID-19.  Dkt. 1317-4 at 4.  Yet, the Government still fails to consider

6  these risk factors in combination with Mr. Reynolds' documented history of heart disease (a

7  prior heart attack), his liver disease, his morbid obesity (caused since his incarceration in an

8  unhealthy environment), and hypertension.  The Government also ignores the lingering

9  consequences of COVID-19, which can continue to cause significant discomfort to those

10 infected for months with unknown long-term effects.  *See* Dkt. 1317-5 at 3-4.[4]

11       In another recent case involving FCI Lompoc, Judge Ellen Hollander of the District of

12 Maryland granted compassionate release for someone who had served about half of his

13 sentence and who had also tested positive for COVID-19, supposedly "recovering":

> Of relevance here, other jurists have released inmates who have ostensibly recovered from COVID-19, based on extraordinary and compelling health reasons. . . . For example ,in *United States v. Christopher Williams*, PWG-19-134, 2020 U.S. Dist. LEXIS 101053, 2020 WL 3073320 (D. Md. June 10, 2020), the defendant had contracted COVID-19 in May 2020. 2020 U.S. Dist. LEXIS 101053, [WL] at *4. And, he had supposedly recovered. *Id*.

---

[3]  Previously, the Government filed a letter to the Court from the Regional Clinical Director of the BOP, Dr. James Pelton of the BOP.  Dkt. 1321, Ex. 1. Not only has Dr. Pelton not personally examined Mr. Reynolds, but his letter contained information not pertinent to Mr. Reynolds, incorrectly stating that Reynolds "has diabetes, which is also well-controlled and therefore, not a risk factor."  *Id*. at 2. It is unclear why Dr. Pelton referred to diabetes, a condition not contained in any of Reynolds' medical records.  Further, Dr. Pelton suggests that Mr. Reynolds' kidney disease can be addressed with "better self-discipline," whatever that means. Certainly, if Dr. Pelton was referring to better diet and exercise, BOP is not providing Mr. Reynolds with either.

[4]  *See also* D. Bogaert, "The coronavirus 'long-hauler' show how little we still know," *The Guardian*, June 28, 2020 (https://www.theguardian.com/commentisfree/2020/jun/28/coronavirus-long-haulers-infectious-disease-testing) (viewed 7/1/20) ("We currently have no understanding at all of the biological mechanisms causing these prolonged symptoms. Theoretically, they may be the result of ongoing or resurgent viral replication – which would be important to know since this would imply prolonged infectiousness as well. Perhaps, however, as observed in more severe cases of coronavirus, the virus may trigger an aberrant immune response, resulting in ongoing inflammation throughout the body, which may last far beyond clearance of the virus. A third alternative, as observed commonly following bacterial pneumonia, is that the coronavirus causes more extensive damage of lungs, heart and other organ systems than suggested by the initial symptoms, which simply requires more time to recover. Without this knowledge, we don't know if long-haulers are infectious for prolonged periods, or whether they are at risk of experiencing severe complications, and certainly not whether treatment might reduce the duration of their problems. Left unattended, these patients may even develop irreversible damage leading to chronic illnesses.").

REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 3
*United States v. Cheatham et al.*, No. CR18-131 RAJ

**Law Office of Neil Fox, PLLC**
**2125 Western Ave., Suite 330**
**Seattle, Washington 98121**
**206-728-5440**

> Yet, Judge Grimm observed, *id*.: "Although recovered, it is uncertain whether [the defendant] can contract COVID-19 more than once, and the potential long-term effects of the illness are still undetermined." In that case, based on the risks presented by defendant's morbid obesity, the conditions at the penal institution, "the uncertainty whether [the defendant] will experience further complications related to COVID-19," and the finding that the defendant is not a danger to the community, Judge Grimm determined that there were compelling reasons for a sentence modification. *Id*.

*United States v. Kess*, 2020 U.S. Dist. LEXIS 105986 at *17-*18, ELH-14-480 (D. Maryland, 6/17/20). The same reasoning applies in this case.

**2.**     ***The Government Ignores Psychological Trauma***

As supplemental authority, Dkt. 1336, Mr. Reynolds cited a recent ruling of Judge Stanley Bastian of the Eastern District of Washington. *United States v. Jorge Baron*, 06-CR-02095-SAB (E.D.WA 6/16/20). While this ruling is not "binding," Dkt. 1343 at 7, Judge Stanley Bastian's discussion of the psychological trauma suffered by Mr. Baron is notable: "Defendant suffered and continues to suffer significant psychological trauma from awaiting infection, being infected, and dealing with the aftereffects of infection." *Baron*, Dkt. 156 at 5.

Because of this language, Mr. Reynolds' latest declaration (Dkt. 1339) centered not on his physical symptoms,[5] but rather on the psychological distress he has suffered due to BOP's failures to protect the residents of FCI Lompoc. He cannot sleep; he worries constantly; he feels hopeless and helpless. He has witnessed traumatic events -- people falling down ill and people dying in front of him. He is locked down, again in a very unhealthy environment, without access to fresh air or exercise, with no hope for change.[6] One should expect there to be life-long effects of such trauma. While BOP sent a psychologist to talk to all of residents

---

[5]     *See* Dkt. 1343 at 6 ("Moreover, the Defendant's declaration filed on June 29, 2020, did not mention any body aches, shortness of breath, or other physical symptoms from COVID-19."). It should be noted that counsel has to schedule legal calls through prison staff and that they are restricted to 15 minutes. Accordingly, the ability to find out key information is heavily restricted and there is simply not time for an extensive interview about current circumstances.

[6]     Notably, the Government has never attempted to submit a declaration from BOP that contests the fact that Mr. Reynolds lives in an unhealthy unit and must use a bathroom with leaking sewage and moldy showers. Dkt. 1317-2.

REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 4
*United States v. Cheatham et al.*, No. CR18-131 RAJ

Law Office of Neil Fox, PLLC
2125 Western Ave., Suite 330
Seattle, Washington 98121
206-728-5440

of his dormitory, Dkt. 1339, there has been no follow up treatment at all – another broken promise of care.

### 3. *Mr. Reynolds Has a Release Plan*

U.S. Pretrial Services recommended that Mr. Reynolds be released prior to trial. Mr. Reynolds was going to stay at the home of his sister in Tacoma at that point. Upon filing the motion for compassionate release, Mr. Reynolds again wished to stay with his sister, but she was in the process of moving back to Tacoma from California. Instead, U.S. Probation approved Mr. Reynolds to live with his niece in University Place "[u]ntil Mr. Reynolds' sister can obtain her own apartment." Memorandum of Timisha Gilbert (6/10/20) (Exhibit 1) (redacted). Because this Court initially denied compassionate release, Mr. Reynolds' sister delayed her return to Tacoma. She could, however, return and obtain an apartment, but at this point, Mr. Reynolds can live with his niece.

In light of U.S. Probation's confirmation that Mr. Reynolds can be supervised in the community and live at his niece's home, it is not clear why the Government claims that Mr. Reynolds has not proposed a "concrete release plan" and that he "has not provided details about where he would live if released." Dkt. 1343 at 4. That is simply incorrect.

The Government also argues that Mr. Reynolds does not show "where he would find financial support, suggesting that he would return to conditions that previously led him to begin selling large quantities of drugs." *Id*. at 5. Apart from the fact that, as will be discussed below, there was never any evidence that Mr. Reynolds sold "large quantities of drugs," the evidence at sentencing was that Mr. Reynolds had devoted his life to caring for his children – he was the primary caretaker on the "home-front," being the one who cooked the meals, cleaned the house, attended PTA meetings, and took his children to sports. Dkt. 960 at 3-4. His younger children still need him and while he proposes to live with his niece, and then his sister, he will still be involved in their lives.

To be sure, from within a locked-down prison, while suffering the long-term effects to COVID-19, Mr. Reynolds has not been able to send out résumés to obtain job offers that would start as soon as he is possibly released. However, Mr. Reynolds clearly has a warm and

REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 5
*United States v. Cheatham et al.*, No. CR18-131 RAJ

Law Office of Neil Fox, PLLC
2125 Western Ave., Suite 330
Seattle, Washington 98121
206-728-5440

loving family to welcome him back into the community, a family that will provide support for him while he recovers from the trauma of the past few months.

### 4. *Mr. Reynolds is Not a Danger to the Community*

The Government argues that Mr. Reynolds is a danger to the community, stating "given the evidence of possible domestic violence at the defendant's arrest, releasing the defendant to stay with a girlfriend or children should be closely examined" Dkt. 1343 at 5. Apart from the fact that Mr. Reynolds did not propose to stay with a "girlfriend" (and the Government just claimed that he did not provide details of where he would stay in any case), there is no evidence of domestic violence. When Mr. Reynolds was arrested in December 2019, living at his family's residence in Maple Valley, police were called to the scene because of loud voices. The police investigated and concluded: "*After speaking with all parties inside the home, it was determined that no physical altercation took place nor was anybody assaulted in any way*." Dkt. 577 at 13 (Ex. 1) (emphasis added). How the Government goes from this conclusion by a police officer on the scene to "evidence of possible domestic violence" is not explained and should be rejected as baseless.

Although Mr. Reynolds has criminal history from many years ago, prior to his indictment in this case, the most recent history was a DUI from 2013. He has no record of violence, domestic or otherwise. While Mr. Reynolds lived openly at his family's home during the time that a warrant from this case was outstanding, the fact that he made no attempt to flee the jurisdiction (and in fact returned to Washington) and the fact that he had no weapons on his person at the time of arrest demonstrate that he neither is dangerous nor was a sophisticated fugitive.

The Government also argues the facts of the case, again claiming that Mr. Reynolds was a "trusted lieutenant for one of the conspiracy's leaders." Dkt. 1343 at 3. Actually, as admitted in the plea agreement, Mr. Reynolds' active role in the conspiracy was confined, on a few occasions between November 2017 and February 2018, to picking up and delivering drugs at the request of co-defendant. Dkt. 737 at 7. There is no indication that Mr. Reynolds was involved in negotiations or discussions about money. While the Government has claimed that Mr. Reynolds was trusted enough to go the alleged "stash house" and pick up drugs for

REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 6
*United States v. Cheatham et al.*, No. CR18-131 RAJ

Law Office of Neil Fox, PLLC
2125 Western Ave., Suite 330
Seattle, Washington 98121
206-728-5440

delivery to another, Mr. Reynolds was little more than an old friend who did a favor for someone else. Mr. Reynolds lived a modest life, without fancy cars or large amounts of cash -- there was never a forfeiture action involving any property owned by Mr. Reynolds connected to this case at all.

Despite his deep involvement in the conspiracy, this Court recently granted compassionate release for Edward Locke, a defendant in the related case to this one, despite the fact that he "was heard on multiple occasions on a wiretap discussing his efforts to obtain and sell various illegal and dangerous drugs, including cocaine, heroin, oxycodone pills, and counterfeit opiate pills containing fentanyl. He was heard on the wiretap discussing being armed in conjunction with his drug trafficking activities." *United States v. Morgan et al.*, CR18-0132 RAJ (W.D. WA 6/11/2), Dkt. 803 at 9. Nonetheless, the Court found that while "he has only served a small percentage of his original sentence, he has demonstrated that extraordinary and compelling reasons exist due to the combination of the COVID-19 pandemic and his extraordinary combination of health conditions which warrant compassionate release." *Id*. at 10. Mr. Reynolds was not heard on any wiretap discussing being armed in conjunction with drug trafficking and thus given the time Mr. Reynolds has served (1 ½ years), there is no reason to believe that he would be any more of a "danger" than Mr. Locke.

The Government is concerned about sentencing disparities, Dkt. 1343 at 4, but in this case everyone anticipated that Reynolds would be incarcerated in a humane place, with proper medical care, and an opportunity for programming such as the RDAP program.[7] Instead, the United States has incarcerated Mr. Reynolds under horrendous conditions that no one, not even someone convicted of a federal drug offense, should have to endure. As Judge Bastian in the Eastern District recently concluded:

---

[7] As noted in the original motion, Mr. Reynolds should not even have been at the minimum custody institution of FCI Lompoc and should have been at "camp," but for the fact that BOP incorrectly has considered two arrests of Mr. Reynolds as a juvenile in Oakland from the 1980s as having dispositions that were "unknown." Dkt. 1292 at 2 n.1. Counsel has attempted to convince BOP staff that these were arrests that did not result in charges but BOP has ignored this information.

REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 7
*United States v. Cheatham et al.*, No. CR18-131 RAJ

Law Office of Neil Fox, PLLC
2125 Western Ave., Suite 330
Seattle, Washington 98121
206-728-5440

> Bluntly, FCI Lompoc has utterly abandoned its responsibility to protect inmates like Defendant. Despite assurances by BOP that they have matters under control—including in statements to members of Congress in Senate hearings—this is clearly not the case. FCI Lompoc was already overpopulated, contributing to the nearly universal infection rate in the prison. Already the subject of at least one lawsuit for the conditions leading to these astronomical infection rates, [footnote omitted] FCI Lompoc has shown it has no ability to protect those incarcerated there.

*United States v. Jorge Baron*, Dkt. 156 at 5.

Similarly, as Judge Hollander of the District of Maryland ruled when granting compassionate release to another person at Lompoc:

> The COVID-19 outbreak has sufficiently increased the severity of the sentence beyond what was originally anticipated.

*United States v. Riley*, 2020 U.S. Dist. LEXIS 98654 at * 21, ELH-16-0402 (D. Maryland, 6/4/20).[8]

Given the extreme conditions that Mr. Reynolds is living in and the threats to his physical and psychological welfare, there would not be any adverse effect on sentencing disparity by an order of compassionate release.

**5.     *Conclusion***

Given the Government's belated recognition that Mr. Reynolds in fact has a medical condition that constitutes an "extraordinary and compelling reason" for release, the Government's acknowledgment that there may be a risk of reinfection, Mr. Reynolds' other medical conditions, the lingering effects of the disease, the uncertainties as to what the future may hold, the lack of proper medical care by BOP, and the trauma that Reynolds has already experienced, the Court should reconsider its original order and grant relief.

DATED this 2nd day of July 2020.

        Respectfully submitted,

        s/ Neil M. Fox
        Attorney for Defendant

---

[8] *See also See also United States v. Donald Delateur*, CR18-5364 BHS, Dkt. 82 at 5 (W.D. WA 7/1/20) (granting compassionate release for someone 9 months into 48 month sentence even though he had a long history of receiving, possessing and distributing child pornography and whose release would result "in a disparity among those guilty of similar conduct.").

REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 8
*United States v. Cheatham et al.*, No. CR18-131 RAJ

Law Office of Neil Fox, PLLC
2125 Western Ave., Suite 330
Seattle, Washington 98121
206-728-5440

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of July 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to attorney of record for the Plaintiff and all other parties.

s/ Neil M. Fox
Attorney for Defendant
REPLY OF DEFENDANT REGARDING RECONSIDERATION - Page 9
*United States v. Cheatham et al.*, No. CR18-131 RAJ

Law Office of Neil Fox, PLLC
2125 Western Ave., Suite 330
Seattle, Washington 98121
206-728-5440